OPINION OF THE COURT
Matthew J. D’Emic, J.
The respondent moves the court for leave to renew his arguments made upon the Mental Hygiene Law article 10 probable cause hearing, and, upon renewal, seeks the dismissal of the petition in the captioned matter, based upon the Court of Appeals’ decision in Matter of State of New York v Donald DD. (24 NY3d 174 [2014]), which was issued subsequent to the hearing court’s finding of probable cause in this matter.
The petitioner opposes this motion on procedural grounds as well as on the merits.
Upon this motion the respondent seeks to have set aside the finding of probable cause made in this proceeding, after a hearing (held on July 18, 2014), and set forth on the record at the hearing’s conclusion and in the court’s order dated August 6, 2014 (Ozzi, J.).
Specifically, the respondent is asking the court to rule, on the basis of the recent decision in Matter of State of New York v Donald DD., that, contrary to the original finding, there is not probable cause to believe that the respondent is a sex offender requiring civil management under article 10 of the Mental Hygiene Law, and, upon reargument, to dismiss the underlying petition.
While this application for renewal was originally brought before the judge who made the finding of probable cause, it has now been transferred to this court for determination, following the permanent reassignment of Justice Ozzi to Richmond County Supreme Court and his referral of the motion and all further proceedings in this matter to the Kings County judge to whom this matter has been assigned.
The court grants the respondent leave to renew, and will reconsider the probable cause finding, in light of the decision in Matter of State of New York v Donald DD. Upon renewal, *494 having read the petition, and having reviewed the hearing transcript and all relevant exhibits, and having further considered the submissions of both parties upon this motion as well as the recent precedent of Matter of State of New York v Donald DD., this court finds that the probable cause finding is sustained. Accordingly, the original determination stands, and the matter shall proceed to trial in accordance with Mental Hygiene Law §§ 10.06 (k) and 10.07.
Statutory Underpinnings and Factual and Procedural Background
Article 10 of the Mental Hygiene Law came into being when the legislature enacted the Sex Offender Management and Treatment Act in 2007 (L 2007, ch 7) to provide for the civil management of sex offenders through civil commitment or supervision.
After preliminary proceedings have taken place, and an initial finding has been made by a “case review team” that a person about to be released from incarceration is a “sex offender requiring civil management” (see Mental Hygiene Law § 10.05), the Attorney General may determine to file a sex offender civil management petition if he deems civil management, beyond the supervision to which the person will already be subject as a result of a criminal conviction, is required for the sex offender (see Mental Hygiene Law § 10.06 [a]).
Upon the filing of such a petition, various statutory proceedings and protections come into play and unfold. Shortly after the petition is filed (normally within 30 days), the court must conduct a probable cause hearing (see Mental Hygiene Law § 10.06 [g]). If “probable cause” is found a trial must ensue, as well as a dispositional hearing if it is determined that the respondent is a sex offender requiring civil management (Mental Hygiene Law §§ 10.06 [k]; 10.07 [a], [f]). Thus, the threshold determination is made by the hearing court, without a jury, as to “whether there is probable cause to believe that the respondent is a sex offender requiring civil management” (Mental Hygiene Law § 10.06 [g], [k]).
Under the statute, a “sex offender requiring civil management” means “a detained sex offender™ who suffers from a mental abnormality” (Mental Hygiene Law § 10.03 [1]). The de *495 termination of this motion, and the focus of the court upon the probable cause hearing and later trial, is on the statutory definition of “mental abnormality.”
“Mental abnormality” is defined as “a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct” (Mental Hygiene Law § 10.03 [i]).
This proceeding was commenced by the Attorney General’s filing and serving of an order to show cause and petition dated March 3, 2014, alleging that the respondent, Kevin J., who was about to be released from a state correctional facility on conditional release, was a sex offender requiring civil management (i.e., either confinement or strict and intensive supervision and treatment),[2] under the provisions of article 10 of the Mental Hygiene Law. Attached to the petition, and incorporated into it by reference, was the article 10 evaluation report prepared by Dr. Jennine Martinez, a licensed psychologist employed by the New York State Office of Mental Health, which summarized her psychiatric examination findings leading to her determination that the respondent is a sex offender with a mental abnormality as defined by article 10.
(The respondent’s criminal and sexual offense history, as well as his institutional record and disciplinary infractions are summarized [replete with details of each sexual offense and of the respondent’s two “lewd conduct” incidents while incarcerated] in both the petition [at 6-9] and the underlying psychiatric evaluation report [at 4-11] and will not be extensively set forth herein.)
Briefly, that history is the following. The respondent committed three separate sexual assaults, all in three days in June of 1985, and it is these three offenses which are the “qualifying offenses” for article 10 purposes. The first, which took place on June 19, 1985, was a forcible rape, sodomy, and sexual abuse (and robbery) at knifepoint, during which respondent repeatedly threatened to kill the female victim and committed various particularly degrading acts upon her. Upon the second *496 incident, on June 20, 1985, the respondent, armed with a knife, grabbed the victim, kissed her and told her he wanted to have sex with her. This did not occur because the elevator in which they were riding arrived at the lobby and a man was there; however the victim was stabbed and the respondent took her purse and another bag. On the third day, June 21, 1985, the respondent robbed the victim of her jewelry and wallet at knife-point on the street and then, holding her by the neck, began to walk her around the corner, stating that he was going to rape her, as he started to undo his jacket and belt. The victim wriggled out of her jacket and the respondent’s grasp and was aided by a man across the street. (Shortly after this incident the respondent was arrested.)
These incidents occurred seven months after the respondent was released on parole (in Nov. 1984) following his conviction for rape in the first degree for offenses he committed in 1979, at the age of 18. On December 21, 1979, the respondent had put a knife to the ribs of a female on the street and demanded money and jewelry. After the victim complied, the respondent took her to a nearby alley, punched her twice in the face when she refused to undress, and forced her to orally sodomize him and then he raped her. The respondent moved the victim further back into the alley and raped her a second time; he was arrested when a police officer arrived on the scene during this second rape.
The respondent’s first contact with the criminal justice system was at age 13 and his criminal activity continued throughout his teens, with arrests for various offenses, many of them involving burglary, assault, and robbery.
According to the State, the respondent committed approximately 74 disciplinary infractions during his most recent period of incarceration. Among these were 20 tier III (high severity) infractions and two instances of “Lewd Conduct.”
Following the filing of this petition, a probable cause hearing, pursuant to Mental Hygiene Law § 10.06 (g), (i), and (k), was conducted on July 18, 2014, before Wayne M. Ozzi, A.J.S.C.
The Probable Cause Hearing and Article 10 Evaluation Report
At the hearing, Dr. Joel Lord, a licensed psychologist employed with the New York State Office of Mental Health and serving as the Chief Psychiatric Examiner there for the Bureau of Sex Offender Evaluation and Community Treatment, testified on behalf of the petitioner. Also, the certified article 10 *497 psychiatric evaluation report of Dr. Jennine Martinez,[3] who had personally interviewed Mr. J. on February 11, 2014, was admitted into evidence, along with two certificates of conviction for the respondent’s prior 1985 convictions (the qualifying offenses). All three exhibits were admitted without objection by the respondent.
Dr. Lord, who had specific training for the assessment of sex offenders,[4] had personally conducted approximately 200 evaluations of sex offenders, in addition to those he reviewed in a supervisory capacity (H at 10).[5] The court (Ozzi, J.) ruled that Dr. Lord was qualified and would be permitted to testify as an expert in the field of psychology and sex-offender evaluation (H at 16).
While he had not personally interviewed Mr. J., Dr. Lord testified that he had read Dr. Martinez’s evaluation and her notes, and had discussed the case with her, prior to her taking maternity leave from the office, as he anticipated having to testify at the probable cause hearing (H at 18-19).
Having reviewed Dr. Martinez’s evaluation report and her interview notes, as well as all of the underlying documents she had read regarding Mr. J.’s history and in conjunction with her evaluation of the respondent, Dr. Lord agreed with, and adopted, all of Dr. Martinez’s conclusions and diagnoses (H at 20-21, 29, 39), including her findings that respondent suffered from antisocial personality disorder and alcohol use disorder (H at 39; R at 14-16), and it was his ultimate conclusion as well “that Mr. [J.] does suffer from mental abnormality” as it is defined in article 10 (H at 43).
Dr. Lord further testified concerning the presence of psychopathy and the indicia of sexual deviance, matters also addressed in Dr. Martinez’s report.
Regarding “psychopathy,” Dr. Lord described it as
*498 “a personality disorder that is . . . generally characterized by a particular ruthlessness, coldheartedness, an inability to empathize with others . . . [that psychopaths] are more prone to instrumental violence; that is, using violence to get what they need . . . and their crimes are generally more violent and occur more frequently than other types of offenders” (H at 33-34).
Employing the most commonly-used scoring instrument, the “Hare Psychopathy Checklist-Revised,” Mr. J. was assigned a psychopathy score of 33.7, with 40 being the highest score (H at 34). This score was deemed to be “very high” and, Dr. Lord indicated, “[w]hen paired with sexual deviance,[6] the recidivism rate has been found to be as high as 70 percent among sex offenders” (H at 35). Continuing, he observed that the “presence of psychopathy indicates a higher level of dangerousness, a higher risk of glib manipulative behavior . . . .” (H at 35.)
When asked if and how psychopathy bore on mental abnormality, Dr. Lord responded thusly:
“Psychopathy, itself, could be predisposing since it is a personality construct and because a psychopath really does not have any empathy because they’re more likely than others to view individuals as objects and more likely to use violence to get what they want; a psychopath may be particularly inclined to get sexual gratification through unwilling partners.” (H at 35.)
Both Dr. Martinez and Dr. Lord had further noted the presence of elements of sexual sadism in the respondent’s June 19, 1985 sex offense. Dr. Lord explained that the degrading, demeaning, and humiliating acts that the victim was forced to perform appeared sadistic and indicative of sexual deviance. While it was “decided not to assign a paraphilia, [the doctors] would have [their] eyes on that going forward” (H at 38). In her *499 report, Dr. Martinez had referred to this in a section entitled, “Conditions Considered But Not Assigned.” Also citing to the June 19, 1985 crime, Dr. Martinez indicated that Mr. J. had “engaged in acts of humiliation, degradation, and gratuitous violence,” and she found these behaviors indicative of sexual sadism. However, because the respondent denied having a history of sadistic thoughts or fantasies and she did not have sufficient information to find that these behaviors occurred over a six-month period of time, Dr. Martinez could not assign a sexual sadism disorder to Mr. J. However, she stated that the diagnosis should be considered if further relevant information or documentation became available or were revealed (R at 16).
Finding that the respondent does suffer from a “mental abnormality” as defined in article 10, Dr. Martinez concluded in her report that “[t]he above diagnosis of Antisocial Personality Disorder with Psychopathy does predispose the Respondent to commit sexual offenses . . . and that [t]he diagnoses of Antisocial Personality Disorder with Psychopathy and Alcohol Use Disorder do result in Mr. [J.] having a serious difficulty controlling such conduct” (R at 16-17).
During his testimony, Dr. Lord gave an overview of Kevin J.’s background history, noting that he exhibited significant behavioral problems by the age of eight (H at 21) and was arrested on a burglary charge at the age of 13, and thereafter, acting with other individuals, was involved in various criminal incidents in the subways and streets. He had also spent 18 months in a Division For Youths secure residential treatment facility. The respondent himself had reported that he first tried alcohol at the age of eight and by age 12 was buying his own alcohol and was a problem drinker.
In discussing the respondent’s criminal history, and, in particular his sexual offenses, Dr. Lord indicated that he saw several patterns, one being that the respondent preferred younger victims, and because he obtained very little money from robbing them, “that suggested to [him] that the primary interest was not money, the primary interest was sexual gratification for each of these attacks” (H at 30).
Dr. Lord also noted (based on Dr. Martinez’s report of her interview with the respondent) that Mr. J. had denied committing any of the sexual offenses which took place during the *500 June 19, 1985 incident[7] and denied having any intent to actually commit a sex offense during the other two June 1985 offenses; he also denied certain aspects of the 1979 offense, including that he had been pulled off the victim by the police (R at 11-12; H at 27-28). Additionally, when asked about his two “Lewd Conduct” prison disciplinary tickets, the respondent denied having intentionally exposed himself to the correction officer (in 1995) and could not even recall a similar 1997 disciplinary ticket (R at 12).
Dr. Lord opined that the “presence of the lewd conduct behavior seem[ed] consistent with a general sexualization of violence or violentization of [respondent’s] sexuality” (H at 31).
In her report, Dr. Martinez had cited to the respondent’s questioning that the victim of the June 19, 1985 incident had even been raped as one of the “Dynamic Risk Factors” she had found which increased his risk to re-offend (R at 14). Overall, based upon her assessment of both “static” and “dynamic” factors, Dr. Martinez had determined that Mr. J.’s sexual recidivism risk was “High” (R at 12). Her scoring of the “static” factors led her to conclude his recidivism risk was 7.32 times higher than that of the typical sexual offender (R at 13). At the hearing, Dr. Lord also explained this scoring of “static” factors (H at 31-33) and discussed some other “dynamic factors” found to be present (H at 37-38). The respondent’s antisocial personality disorder is also counted among the dynamic risk factors, under the rubric of “Antisocial Orientation” (see R at 13) and his psychopathy was also included as another dynamic risk factor (R at 13; H at 38).
As noted above, it was Dr. Lord’s professional opinion and conclusion that Mr. J. suffers from a “mental abnormality” as it is defined in article 10 (H at 43).
Following Dr. Lord’s testimony, the petitioner rested. The respondent did not present any testimony or offer any evidence on behalf of Mr. J. and also rested at that time.
At the conclusion of the probable cause hearing, in addition to raising a due process objection to the receipt of Dr. Lord’s testimony and moving that it be stricken,[8] the respondent also argued that the petition should be dismissed on the ground *501 that the petitioner had failed to meet its burden of proof to establish that Mr. J. suffered from a mental abnormality as defined in the statute (H at 96-104). Specifically, it was urged that the State had not shown that the respondent was predisposed to committing sexual offenses and had a serious difficulty in controlling such sexual-offending conduct.
In opposition to the respondent’s post-hearing applications and dismissal argument, the State asserted that it had met its burden of establishing probable cause by a preponderance of the evidence, through the introduction of the evidence of Mr. J.’s mental disorders, his criminal and institutional history, and other factors relied upon in the calculation of the actuarial instruments, as well as the interview responses, all of which were shown to bear upon the issue of “mental abnormality.” (H at 106-108.)
After hearing oral argument from both sides, the court denied the respondent’s application to dismiss the petition, finding that the petitioner had met its burden of proof and had established reasonable cause to believe that the respondent currently has a mental abnormality as defined in the Mental Hygiene Law, to wit, “a congenital or acquired condition, disease or disorder that affects his emotional, cognitive or volitional capacity in a ma[nn]er that predisposes him to the commission of conduct constituting a sex offense and results in that person having serious difficulty controlling such conduct” (H at 111). Having also found that the respondent was a “detained sex offender” under the statute, the hearing court thus concluded that there was reasonable cause to believe that he is a sex offender requiring civil management. (The court additionally determined that the respondent was sufficiently dangerous to require his confinement for the pendency of these proceedings, until final resolution thereof [H at 111-112].) Therefore, the respondent was ordered confined, and the matter was set down for October 1, 2014, for a pretrial conference.
Since that hearing, and prior to any article 10 trial taking place in the instant matter, the Court of Appeals issued its decision in Matter of State of New York v Donald DD. on October 28, 2014 (24 NY3d 174). In that case[9] our High Court reversed the Appellate Division’s affirmance of the trial court’s finding, *502 based upon a jury verdict, that the respondent, Donald DD., suffered from a mental abnormality and therefore required civil management.
The Donald DD. court found, by a 4 to 3 majority, that
“in a Mental Hygiene Law article 10 trial, evidence that a respondent suffers from antisocial personality disorder cannot be used to support a finding that he has a mental abnormality as defined by Mental Hygiene Law § 10.03 (i), when it is not accompanied by any other diagnosis of mental abnormality” (Donald DD., 24 NY3d at 177).
It was that Court’s conclusion that a civil commitment under Mental Hygiene Law article 10 cannot be based solely on a diagnosis of antisocial personality disorder (ASPD), together with evidence of sexual crimes {id. at 189).
The majority in Donald DD. explained that, in order for a civil commitment finding to be constitutional and comport with due process, the evidence pertaining to his condition “ ‘must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case ’ ” {id. [citations omitted]).
Highlighting the studies and statistics which estimate that anywhere from 40% to 80% of convicted, imprisoned criminals could be diagnosed with ASPD, and that “ASPD ‘means little more than a deep-seated tendency to commit crimes’ ” the Court of Appeals found that
“[a] diagnosis of ASPD alone — . . . when [it] is not accompanied by a diagnosis of any other condition, disease or disorder alleged to constitute a mental abnormality — simply does not distinguish the sex offender whose mental abnormality subjects him to civil commitment from the typical recidivist convicted in an ordinary criminal case. . . . Its use in *503 civil confinement proceedings, as the single diagnosis underlying a finding of mental abnormality as defined by Mental Hygiene Law article 10, proves no sexual abnormality [and] [i]t therefore cannot be the sole diagnosis that grounds such a finding.” (Donald DD. at 190 [citation omitted].)
The “problem” with an ASPD diagnosis, for the Court of Appeals, was that “ASPD establishes only a general tendency toward criminality, and has no necessary relationship to a difficulty in controlling one’s sexual behavior” (id. at 191).
Thus, it was the majority’s ultimate conclusion that the Supreme Court in Donald DD. “erred in using an ASPD diagnosis, together with testimony concerning Donald DD.’s sex crimes, but without evidence of some independent mental abnormality diagnosis, to ground a finding of mental abnormality within the meaning of Mental Hygiene Law article 10” (id.).
Relying on this precedent, the respondent seeks renewal of the court’s probable cause hearing finding upon his contention that there is no sexual disorder diagnosis here and that the additional diagnosis of alcohol use disorder also does not support a finding of a “mental abnormality.” Thus he maintains that the probable cause finding must be vacated and the petition dismissed.
Counsel for the respondent opines that “Mr. [J.]’s case is materially identical to Donald DD.’s,” because, here too, the respondent is diagnosed with ASPD and is not diagnosed with any other condition or disorder of a sexual nature which would create a predisposition to commit sexual offenses and meet the definition of a mental abnormality under Mental Hygiene Law article 10.
In response, the State contends that renewal here is improper as it effectively constitutes an impermissible appeal from the nonappealable probable cause determination. The State also maintains that Donald DD. does not apply to pretrial article 10 proceedings (such as the probable cause hearing) given that the Court of Appeals’ decision was made after trial, on trial evidence, and pertains to the article 10 trial burden of proof, clear and convincing evidence. Additionally, the State indicates that such an interpretation (that Donald DD. does apply to a probable cause determination) would not comport with the statutory scheme which provides for pretrial discovery and psychiatric examinations in order to develop the case and provide relevant information towards making the *504 ultimate civil management determination. For, to limit the petitioner’s proof to what was adduced upon the probable cause hearing and thereby preclude further discovery and allow for the dismissal of the petition based upon the record at the probable cause stage would subvert the legislative design for article 10.
In any event, turning to the merits, the State maintains that it has met its evidentiary burden of establishing probable cause that respondent is a sex offender requiring civil management, even under Donald DD. In so arguing, the State notes that it disagrees with the respondent’s assertion that Donald DD. requires a sexual disorder diagnosis in order to establish a “mental abnormality” under article 10. Rather, the State reads Donald DD. to hold that the ASPD diagnosis alone, without evidence of any other condition or disorder, is insufficient as it does not differentiate a sex offender who would be subject to civil commitment from the typical recidivist convicted in an ordinary criminal case, and that there must be another diagnosis, which, however, the State maintains need not be one listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM). Thus, since evidence was presented that the respondent here also suffers from alcohol use disorder and was found to score very high on the scale for psychopathy,[10] and Dr. Martinez’s report and Dr. Lord’s testimony both indicated how these conditions were relevant to their finding of the respondent’s mental abnormality, the State contends this distinguishes the respondent from Donald DD. as well as from the “typical recidivist,” and renders the Donald DD. dismissal determination inapplicable herein.
In reply, the respondent disputes the procedural objections raised by the State and reiterates his assertion that the precedent of Donald DD. is applicable, regardless of the specific evidentiary burden, and that because all of the petitioner’s diagnoses are for nonsexual disorders, the probable cause finding is not supported by legally sufficient evidence. The respondent also argues that the factual allegations of the petition are legally insufficient. Therefore, it is urged, the proceeding cannot go forward. In respondent’s reply, counsel also reiterates and elaborates upon her previous arguments rejecting Mr. J.’s psychopathy diagnosis as providing a basis for a finding of *505 mental abnormality, and again dismisses the “non-sexual diagnosis” of alcohol use disorder as also being insufficient to support such a finding, asserting that it only bears on the difficulty in controlling sexual-offense conduct, what respondent terms the “second prong” of the definition.
Discussion
As noted above, this application has been referred to this court for determination. Although not the original hearing court, this court has thoroughly familiarized itself with the record in this proceeding and determines the motion as follows.
Contrary to the State’s procedural objections, the court finds it appropriate to entertain renewal here, pursuant to CPLR 2221, on the basis of the Court of Appeals’ recent determination in Matter of State of New York v Donald DD. insofar as the case speaks to what evidence the Court has ruled is legally insufficient to establish a “mental abnormality” under article 10, and therefore could impact the probable cause finding; further, the court does not find this to be a backdoor appeal of the probable cause hearing determination in contravention of Mental Hygiene Law § 10.13 (b). Additionally, the court will not reject the respondent’s motion simply on the ground that he is relying on a posttrial decision[11] to attempt to obtain the dismissal of the petition before trial has been held in this matter.
Nevertheless, this court concludes that the respondent’s reliance on Donald DD. is misplaced and its holding does not mandate the dismissal of the petition at this point in the proceedings. Indeed, the court finds that this case differs from Donald DD. in several significant ways (both factually and procedurally) and that it is not “materially identical” to it, as contended by the respondent.
It is noteworthy, and a critical distinction, that the Donald DD. holding relates to the court’s finding after a trial. Unlike Donald DD., no trial has yet been held in this case. This matter is still only at the “probable cause” stage of these proceedings. It is only at trial where the State is required to establish its case for civil management by “clear and convincing evidence” (Mental Hygiene Law § 10.07 [d]).
*506 By contrast, the ruling in issue at bar is the court’s finding at the conclusion of a probable cause hearing that there is here “probable cause to believe that the respondent is a sex offender requiring civil management” (Mental Hygiene Law § 10.06 [g], [k]) and, specifically, that there is probable cause to believe that the respondent currently has a mental abnormality as defined in the Mental Hygiene Law, to wit, “a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of [the respondent] in a manner that predisposes him ... to the commission of conduct constituting a sex offense and results in [his] having serious difficulty in controlling such conduct” (Mental Hygiene Law § 10.03 [i]). The purpose of a probable cause hearing is “to determine ‘whether there exists sufficient evidence to proceed to trial’ ” (Matter of State of New York v Anonymous, 79 AD3d 758, 761 [2d Dept 2010], citing to State of New York v Pedraza, 18 Misc 3d 261, 266 [Sup Ct, Suffolk County 2007]).
In Anonymous, discussing and describing the probable cause standard of proof, the Second Department observed that
“[t]he term ‘probable cause’ is not defined in Mental Hygiene Law article 10. In the context of a Mental Hygiene Law article 10 proceeding, courts have adopted the standard applicable to a preliminary hearing in a criminal case, namely, whether there exists ‘reasonable cause to believe’ that the sex offender requires civil management [,] [and] have rejected a heightened standard of proof such as the ‘clear and convincing’ standard or the ‘fair preponderance of the evidence’ standard.” (Matter of State of New York v Anonymous at 759-760 [citations omitted].)
The Anonymous court found, and this court agrees with its rationale and concurs in that finding, that the “reasonable cause to believe” standard of proof should apply at a probable cause hearing pursuant to Mental Hygiene Law article 10. (Indeed, this court is required to follow this precedent.)
Elaborating upon its conclusion, the Second Department indicated that the purpose of a probable cause hearing
“is ‘simply to ensure that there is a basis for holding the respondent for trial, at which time a heightened [clear and convincing] standard of inquiry will apply,’ as provided under Mental Hygiene Law § 10.07 (d) [and that] in assessing probable cause, ‘[i]t would not make sense at this prelimi *507 nary stage to impose a high standard of proof similar to the one that will ultimately be used by the finder of fact after presentation of all of the evidence’ ” (id. at 760 [citations omitted]).
Thus, while the rule announced in Donald DD. applies to the court’s finding here, it was not the State’s burden to demonstrate by “clear and convincing evidence” that Mr. J. currently suffers from a “mental abnormality” as defined by the governing statute.
Rather, the State was required to show probable cause, that is, probable or reasonable cause to believe that the respondent is a detained sex offender who suffers from such a “mental abnormality”; or, to describe it in practical terms, that there is enough evidence to go forward. The court concludes that the State has met this burden.
This court is not unfamiliar with this burden of proof and the evidentiary standard applicable upon review of such determinations for legal sufficiency, for such a finding (and the court’s review thereof) is akin to the reasonable cause determination of a grand jury[12] which is necessary to return an indictment and to permit a criminal action to go forward.
Having reviewed the probable cause hearing minutes and the underlying, supporting documents, this court concludes that the State has here established probable cause to believe that Mr. J. suffers from a “mental abnormality,” and that this matter should proceed to trial under article 10. In reaching this determination, the court is mindful of the Court of Appeals’ holding in Donald DD.
The resolution of the application hinges on the evidence adduced upon this hearing and the court finds it factually distinguishable from Donald DD. and the probable cause evidence sufficient to withstand dismissal at this point.
*508 Here, unlike Donald DD., in addition to having been diagnosed with ASPD, Mr. J. was also diagnosed with psychopathy[13] and was found to suffer from alcohol use disorder. Additionally, he displayed some aspects of sexual deviance and sexual sadism, although not formally diagnosed with these conditions. Therefore it would not be appropriate to dismiss the petition at this point.
Comparing the instant case to Donald DD., the respondent maintains that the “psychopathy” diagnosis here is “meaningless,” and that ASPD and psychopathy are “interchangeable” diagnosis terms, and thus a “mental abnormality” is not established here.
The court disagrees with this assessment and finds it premature to reject the “psychopathy diagnosis” as adding nothing to the ASPD diagnosis.
Since the Donald DD. decision did not address the impact of a psychopathy diagnosis on a mental abnormality finding, and the degree and nature of Donald DD.’s psychopathy is not disclosed much less discussed in the decision, it cannot be concluded that the Court of Appeals rejected this condition as providing support for a mental abnormality finding.
Further, there is no reason to assume that the respondent’s psychopathy is comparable to that of Donald DD. Nor is there any basis for concluding here that his psychopathy should be deemed to be merely a form of ASPD or an extension of the ASPD diagnosis and that the two diagnosis labels are “interchangeable,” as urged on behalf of the respondent, based upon a single line counsel has cited from the Diagnostic and Statistical Manual of Mental Disorders (at 659 [5th ed]) (DSM-5), from the section on ASPD {id. at 659-663) attached to the motion.
This court also views it as improper to consider this DSM-5 excerpt submission by respondent as it is effectively being first tendered now as additional evidence, outside the petition and hearing record, for the purpose of rebutting both the conclusions of Dr. Martinez and Dr. Lord and the hearing testimony of Dr. Lord, all of which appeared to indicate that psychopathy was a separate diagnosis and different condition than ASPD. The court’s “review” of the hearing findings is within the *509 confines of the present application for renewal in light of the Donald DD. decision. The record cannot be expanded or supplemented and this is not an opportunity to present new or additional evidence to rebut or impeach the hearing evidence. In any event, the State had only to adduce sufficient, competent evidence to demonstrate “reasonable cause to believe” that the respondent is a detained sex offender who suffers from a “mental abnormality” as would warrant that the article 10 proceedings should go forward. The State did meet this threshold level of proof.
Moreover, the Court of Appeals has indicated that, in evaluating a sex offender and in arriving at a professional opinion that a person does or does not suffer from “a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct” (see Mental Hygiene Law § 10.03 [i]), the psychiatric examiner is not limited to DSM diagnoses (see Matter of State of New York v Shannon S., 20 NY3d 99, 106 [2012], cert denied 568 US —, 133 S Ct 1500 [2013]).
Explaining this, the Shannon S. court observed that
“in the civil confinement arena, there will undoubtedly be an ‘imperfect fit between the questions of ultimate concern to the law and the information contained in [the DSM’s] clinical diagnosis’ .... In New York, the plain language of Mental Hygiene Law § 10.03 (i), in defining a mental abnormality, . . . like the analogue statutes of several states, does not reference or require that a diagnosis be limited to mental disorders enumerated within the DSM. Therefore, ... a mental abnormality ‘need not necessarily be one so identified in the DSM in order to meet the statutory requirement.’ ” {Id. [citations omitted].)
Since “mental abnormality” is not a medical definition, but rather, a legal one, and there is no enumeration in the statute as to which disorders may meet that definition nor any requirement that the qualifying conditions and disorders be limited to those contained in the DSM, there is no basis for the court to reject (at this point, on this record) a psychopathy diagnosis, nor to hold, even on the authority of Donald DD., that the *510 diagnoses and evidence of mental disorders here presented are insufficient to meet the probable cause threshold. Further, it is important to note that “the governing statute expressly contemplates that psychiatric examiners will have access to and consider all of a ‘respondent’s relevant medical, clinical, criminal or other records and reports’ (Mental Hygiene Law § 10.08 [b])” and that such documentary evidence may properly be relied upon by the psychiatric examiner in forming an expert opinion (see Matter of State of New York v Mark S., 87 AD3d 73, 77-78 [3d Dept 2011], lv denied 17 NY3d 714 [2011]).
Of course, whether the State will meet its burden at trial is another matter, and beyond the scope of this decision.
The court would like to briefly address one final point of contention between the parties here. It is the respondent’s position, based on counsel’s interpretation of the Donald DD. decision, that nonsexual disorders simply cannot support an article 10 finding of “mental abnormality,” and, in fact, the respondent maintains that, as a matter of law, the predicate condition, disease, or disorder must be sexual in nature to find a mental abnormality. The petitioner does not concur in this interpretation of Donald DD.
In this court’s view, reading Donald DD. both literally and in the context of the factual record of that case and of the governing statute and its legislative history and purpose, the Court of Appeals did not hold, as a matter of law, that there must be a finding or diagnosis of a sexual mental condition or disorder to support a finding of a “mental abnormality” as defined in article 10.
The court’s literal holding was a rejection of the ASPD diagnosis as being sufficient alone to support a mental abnormality finding when merely coupled with a history of sexual offending. Thus, it could be argued that here, the additional diagnosis of alcohol use disorder suffices to take this case outside the ambit of the Donald DD. holding; however, this court is inclined to agree that the deficiencies the court found with the ASPD diagnosis are also present in the alcohol use diagnosis. Nevertheless, that would not be fatal to the probable cause determination at bar because of the other conditions and disorders the doctors here found presented by the respondent, namely psychopathy, sexual deviance, and sexual sadism.
Thus, in any event, even if Donald DD. can be said to require a sexual aspect (beyond a pattern of committing sexual offenses) to the respondent’s underlying condition or mental dis *511 order, that too has been established for purposes of the probable cause finding.
Lastly, while not determinative of this court’s finding, the court does note that when the underlying psychiatric examination was conducted and when this probable cause hearing was held, the State could not have known that the Court of Appeals would soon be holding that an ASPD diagnosis alone is insufficient to support a mental abnormality finding, even with a history of sexual offenses. Since the petitioner did not have to prove a “mental abnormality” by clear and convincing evidence at this hearing, and there is sufficient evidence in this record to support a probable cause finding, the matter should proceed to trial, where the State will be held to the higher, trial burden of proof, under the parameters of the Donald DD. case, of which it now has notice.
Whether, ultimately, after trial, there will be legally sufficient evidence of mental abnormality as to support a finding either that Mr. J. should be civilly confined or that he requires strict and intensive supervision and treatment, is unknown, and is an issue not before the court today. It is this court’s determination that the precedent of Donald DD. does not mandate the dismissal of the petition at this point and time.
The court additionally notes that the so-called “second prong” of the “mental abnormality” definition, requiring (a showing) that the respondent’s condition(s) result in him having a serious difficulty controlling sex-offense conduct, is also sufficiently established to withstand dismissal at this stage of the proceedings.
Lastly, turning to the hearing court’s determination to confine the respondent for the pendency of these proceedings, that ruling remains intact and in effect. Accordingly, the court orders that the matter proceed to trial as soon as is practicable.
In conclusion, having granted leave to renew, the court determines that probable cause is here established and that the petition should not be dismissed here on this record, and that, upon renewal, the respondent’s motion is, respectfully, denied.

1. There is no question here that the respondent was a “detained sex offender” as he had been in the custody of the New York State Department of *495 Corrections and Community Supervision upon a conviction of a sex offense (see Mental Hygiene Law § 10.03 [g]).

. See Mental Hygiene Law § 10.07 (f).

. Dr. Martinez had spoken with Mr. J. for almost 3V2 hours when she conducted her evaluation interview on February 11, 2014. Her completed article 10 evaluation report was dated February 24, 2014. At the time of the probable cause hearing, in July of 2014, Dr. Martinez was out of the office on extended leave. Her supervisor, Dr. Lord, testified in her place.

. In discussing his training, Dr. Lord indicated that, insofar as his doctoral dissertation studies were in the field of psychopathy, he became trained in assessing sex offenders “because that was one of the primary uses of the psychopathy checklist [he] was using” (hearing tr at 10).

. Citations to the hearing transcript will be parenthetically denoted by “H,” followed by the page number. Likewise, citations to Dr. Martinez’s article 10 evaluation report will be preceded by “R.”

6. In her report, Dr. Martinez had also summarized her assessment of the respondent vis-a-vis the various “Dynamic Risk Factors” which increased his risk to re-offend (R at 13-14). Under the heading of “Deviant Sexual Interest/ Deviant Sexual Preference,” she observed, among other things, that Mr. J. had “also engaged in behaviors that were likely aimed at degrading and humiliating one of his victims.” And, under “Psychopathy/Psychopathy Combined with Sexual Deviance,” noting Mr. J.’s score of 33.7, which was “indicative of a strong presence of psychopathic traits,” Dr. Martinez recounted that “[Research has found that offenders who have psychopathy and sexual deviance are more likely to commit additional sex offenses when compared to sex offenders without these conditions.” (R at 13.)

. Meanwhile, it is observed that the respondent pleaded guilty to sexual offenses arising from the June 19 and June 20 incidents.

. The court overruled this objection and denied the application to strike the testimony.

. Decided together with Matter of State of New York v Donald DD. was the appeal in a companion case, Matter of State of New York v Kenneth T. The Court’s determination in Kenneth T. has no particular bearing upon the issues raised in the instant matter as the Court dismissed the petition in *502 that case because it had not been established, by clear and convincing evidence, that Kenneth T. had serious difficulty in controlling his sexual misconduct within the meaning of the statute. What the holding in Kenneth T. does make clear, is that, in addition to establishing that the respondent suffers from a “condition . . . that predisposes him ... to [commit] sex offense [s]” (see Mental Hygiene Law § 10.03 [i]), it must also be proved that the person has “serious difficulty in controlling such conduct” (Donald DD. at 187-188; Matter of State of New York v Frank P., 126 AD3d 150, 159 [1st Dept 2015]).

. In discussing psychopathy, State’s counsel maintains that psychopathy is a diagnosis independent of ASPD (and not synonymous with it), and that it is also relevant to a finding of mental abnormality.

. While the petitioner’s assertion is accurate, in this court’s view this is not a basis to deny the motion procedurally. Rather, the difference in the procedural stage of the case in Donald DD. (posttrial) from that in the matter sub judice (pretrial, post probable cause hearing) is addressed in the analysis and taken into account in the resolution of the motion on the merits.

. In order to indict, a grand jury must have legally sufficient evidence to establish that the person committed the offense in question and “competent and admissible evidence” before it which “provides reasonable cause to believe” that such person committed such offense (see CPL 190.65 [1]).
Continuing with this analogy, presented with an application to dismiss an indictment on the basis of insufficient evidence before the grand jury, “[t]he reviewing court must consider whether the evidence, viewed most favorably to the People, if unexplained and uncontradicted — and deferring all questions as to the weight or quality of the evidence — would warrant conviction” (People v Swamp, 84 NY2d 725, 730 [1995] [citations omitted]; see also People v Bello, 92 NY2d 523, 525 [1998]). Likewise, in assessing this article 10 petition and the probable cause hearing evidence, the court must decide whether the State here has made a prima facie showing of “mental abnormality.”

. The court hastens to note that there was a mention, in a footnote, in the Donald DD. opinion, of his having also been diagnosed with psychopathy (see Matter of State of New York v Donald DD. at 183 n 3); however there was no discussion concerning psychopathy as neither expert found that it affected their conclusions regarding Donald DD.’s article 10 mental abnormality.